IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

MISSOURI & NORTHERN ARKANSAS RAILROAD COMPANY, INC. PLAINTIFF

v. No. 1:10-cv-8-DPM

ENTERGY ARKANSAS, INC. DEFENDANT

# ORDER

**1.** The parties tried this case during several days in December 2011. The jury returned a verdict finding three things: Leal was injured "on or about Switch" when he slipped and fell in the mud near Entergy's back gate; Leal sustained injury "from an[] act or omission" by Entergy; MNA was negligent, and that negligence was a proximate cause of Leal's injuries. *Document No. 119.* All the quoted phrases are from the parties' industrial track agreement, which creates and defines Entergy's indemnity obligations in various particular circumstances, including those presented by Leal's slip and fall. *Document No. 37-1.* The Court denied the parties' motions for judgment as a matter of law at the close of MNA's case. The parties renewed those motions at the close of all the proof; the Court took them under advisement so the record would include the jury's verdict after a full trial.

The Court appreciates the parties' prompt and succinct post-trial briefs. Those papers, like counsels' efforts throughout the case, were helpful and ably done. The Court regrets its delay in turning back to the motions for judgment. The governing procedural standard is not disputed. FED. R. CIV. P. 50(a); *Shaw Hofstra & Associates v. Ladco Development, Inc.*, 673 F.3d 819, 825 (8th Cir. 2012).

**2.** The Court confirms its oral ruling after verdict denying the cross motions directed at the "on or about Switch" issue. The parties' contract is ambiguous on the reach of the term "about"; and the particulars of Leal's accident and railroad/industry practice, all matters of extrinsic evidence, were disputed. This issue was thus for the jury. *Smith v. Prudential Property and Casualty Insurance Co.*, 340 Ark. 335, 341, 10 S.W.3d 846, 850 (2000). Its verdict stands.

**3.** The cross motions for judgment as a matter of law on whether Leal's injuries were traceable to any act or omission by Entergy are denied too. MNA's motion is moot because the jury decided the issue in the railroad's favor. *Document No. 119.* Entergy's motion is denied because the proof would have supported a reasonable juror's verdict either way. Entergy did not cause

all the rainy weather or the mud, of course. But Entergy's gate was made so it could swing wild off the road, back into the uneven area near the fence, an area that was weedy and muddy that night. Considering the lack of evidence about any similar problems or incidents, and Entergy's stern direction to MNA to keep the gate locked, the jury could have found that Leal's fall in the dark was just an accident, an unforeseeable event in an imperfect world. The jury's contrary conclusion, though, is well supported by the nature of the gate, the road, and the area between the road and the fence, coupled with the many days of rain, which should have put Entergy on notice that this area would be a soggy, muddy mess, exposing users of the back gate to dangerous conditions.

**4.** In their contract, the parties agreed that, in the circumstances established by the jury's answers to questions 1 and 2, Entergy would owe full indemnity unless negligence by MNA was a proximate cause of Leal's injury too. "[I]f any claim or liability shall arise from joint or concurring negligence of [Entergy and MNA], it shall be borne by them equally." *Document No. 37-1, at 4.* These issues were captured in the Court's instructions 14, 15, 16, 17, and 18 and question 3 on the verdict form. With an

exception noted in the margin, the parties agreed with these instructions and this question. This is a matter of the railroad's alleged negligence under Arkansas common law, not under the FELA. *Burlington Northern, Inc. v. Hughes Brothers, Inc.*, 671 F.2d 279, 285 (8th Cir. 1982).* The jury answered question 3 "yes," which would divide liability for the Leal settlement 50/50.

MNA makes two main arguments for judgment as a matter of law on apportionment. First, the railroad says it owed Leal no duty of care as to Entergy's premises, and therefore cannot be negligent. *E.g., Lewis v. AT&T Mobility*, 2011 Ark. App. 756, at 4, 2011 WL 6062678, at *2 (duty in general). Second, MNA says it violated no standard of care—nothing the railroad did or did not do proximately caused Leal's slip and fall; the railroad had no reason to foresee any danger; and the muddy area was, in any event, open and obvious to Leal, which he acknowledged at trial.

Entergy responds with a punch list. There are, Entergy contends, at least eight facts that make MNA's negligence a jury question.

---

* By argument and proffered instructions, Entergy preserved its contention that *Hughes Bros.* and like cases are wrongly decided on this point.

- MNA had unfettered access to the gate and had had this access at least since 1996 (Richardson testimony);

- MNA's use of the back gate was for its own convenience (Richardson testimony);

- MNA affixed its own lock on the gate to have such access (Richardson, Leal, Bradberry testimony);

- MNA personnel routinely used the back gate, much more so than Entergy personnel (Bradberry testimony);

- The area had been muddy due to rainfall over the past two weeks leading up to the date of the injury (Leal testimony);

- Richardson came to the plant at least weekly and periodically went to the gate area (Richardson testimony);

- A safety rule that MNA should follow is to always use the safest route (Richardson testimony), yet Leal was never instructed to use the front gate (the safer route) when the back gate area was wet or muddy;

- No MNA personnel ever notified Entergy that the conditions at the back gate constituted a hazard or requested repairs or improvements (Leal, Bradberry, Richardson testimony).

*Document No. 123, at 7–8.* The Court can't improve on Entergy's summary of its legal argument from these facts.

> MNA actively and affirmatively adopted the back gate area as a place at which its personnel would access the switch. MNA certainly had knowledge of the wet and muddy conditions, yet—unlike the situation in *Hughes Bros.*—MNA did nothing at all to warn or advise its employees or [Entergy] that the conditions constituted a hazard, did nothing at all to implement its own safety rule to use the safest route, and did nothing at all to prohibit or prevent its employees from using the back gate area under the conditions present at the time of Mr. Leal's injury.

*Document No. 123, at 8.*

A preliminary point: acquiescence. The parties skirmish over this doctrine, and whether it is part of Arkansas law in an indemnity case stemming from a FELA settlement. This issue is vexed. *Compare Missouri Pacific Railroad Co. v. Arkansas Oak Flooring Co.*, 434 F.2d 575, 580–81 (8th Cir. 1970) (suggesting applicability of acquiescence under Arkansas common law on the apportionment issue in a FELA-related case), *and Missouri Pacific Railroad Co. v. Winburn Tile Manufacturing Co.*, 461 F.2d 984, 988-89 (8th Cir. 1972) (acquiescence applied under Arkansas law in a FELA-related apportionment dispute, but holding facts do not sustain it), *with Nabholtz Construction Corp. v. Graham*, 319 Ark. 396, 403-04, 892 S.W.2d 456, 461 (1995) (declining to adopt acquiescence in a non-FELA related indemnity case under Arkansas law).

The Court need not sort this law out. The facts, taken in the light most favorable to Entergy, don't come close to creating a question about acquiescence. There was no evidence MNA actually discovered the dangerous condition with the gate swinging back into the weedy, uneven, and muddy area, much less any evidence that the railroad acquiesced in the situation continuing for so long a time that the railroad became a joint participant in this condition. *Hughes Bros.*, 671 F.2d at 285-86. Even if acquiescence is part of Arkansas common law in FELA-related indemnity disputes, the doctrine does not apply on this record.

MNA's no-duty argument echos points made on summary judgment, now with the benefit of the trial record. The issue takes the case into the old law about master and servant. The FELA and the Arkansas Workers Compensation Act must be set aside; what was the scope of MNA's common-law duty, as principal, to Leal, the railroad's agent, regarding working conditions at Entergy's back gate? In answering this question, the Court has considered general negligence principles, older Arkansas cases about masters and servants, and the *Restatement (Second) of Agency* §§ 492–528, which distills the applicable common law. These legal rules are much like those about a

business owner and his invitees, but with some variations. RESTATEMENT, introductory note to title C, "Non-delegable Duties of Master", p. 435. MNA's argument from the Arkansas law of premises liability is thus illuminating, though not controlling.

MNA had a non-delegable duty to provide Leal a reasonably safe place to work and warn him about unsafe conditions MNA should have realized that Leal might not discover even though he was exercising due care. *E.g.*, *Bryant Lumber Co. v. Stastney*, 87 Ark. 321, 324–25, 112 S.W. 740, 741 (1908); RESTATEMENT § 492. The scope of MNA's duty diminishes on premises beyond the railroad's control. Though the Court has not found an Arkansas case directly in point, the *Restatement* accurately captures the common law.

> The [M]aster's duty as to working conditions does not extend to the condition of premises not in his control . . . except that he has a duty to disclose dangerous conditions of which he should know.

RESTATEMENT § 504. This duty of disclosure or warning is further refined depending on the circumstances. More on this point after exploring the facts, in the light most favorable to Entergy, about MNA's control of conditions at the back gate.

The Court is not persuaded by Entergy's argument that the railroad could control those conditions. Yes, MNA had total access for many years with its own lock as part of the dual-lock system. Yes, the access was routine and regular, not an occasional thing like a UPS delivery. But there was no evidence presented that MNA altered or maintained the back gate, the road, or the shoulders. There was no evidence that the railroad could do so. There was, for example, no agreement (oral or written) with Entergy that the railroad could control these premises. And there was no evidence that Entergy ever altered the gate or surrounding area at MNA's request or direction. As MNA's "keep the gate locked" memo emphasized, *MNA Trial Exhibit 29*, this routine access was a privilege, a mutually beneficial arrangement, that Entergy could end at will. Notwithstanding the clear record of years and years of use whenever MNA chose, the proof failed on Entergy's theory that the back gate was *de facto* MNA premises. The railroad neither owned nor occupied the back gate area. Unfettered access is not control.

This does not end the duty analysis, though. MNA also had the duty to disclose or warn Leal about dangers the railroad should have known about

that were not "obvious and patent . . ." to him. *Stastney*, 87 Ark. at 325, 112 S.W. at 741; RESTATEMENT § 492 & comment g and § 504 & comment b. The duty question, which is a matter of law for the Court, comes in two steps. Should MNA have known about the dangerous conditions at the back gate? If so, were those conditions obvious to Leal, thus eliminating the need for a warning?

The Court has no difficulty concluding that MNA should have known about the less-than-safe conditions that night at the back gate. First, MNA had been using this access for more than five years. Second, the gate and shoulders and road, insofar as the proof disclosed, had always been in substantially the same condition. Third, the gate's construction allowed it to swing wild onto the unimproved shoulder. Fourth, it had been raining for many days before Leal's fall. Fifth, MNA personnel regularly used the back gate, including during this rainy spell. Their knowledge of conditions is imputed to the railroad, their employer. *Winburn Tile*, 461 F.2d at 988. Sixth, Ryan Richardson, MNA's Superintendent of Operations, was familiar with the back gate, had used it, and was at the Entergy plant once a week or so. Richardson is the one who sent the memo stressing to Leal and his co-

coworkers that the gate "must always without fail" be locked. *MNA Trial Exhibit 29* (emphasis original). Considering this record as a whole, the railroad should have known about the dangerous conditions Leal faced that night.

But this is not enough to create a duty to warn or disclose. The danger presented must have been obscure to Leal even had he been exercising due care. RESTATEMENT § 492. This part of the doctrine is the analog to the obvious-danger exception in premises-liability cases, which MNA argues hard. *E.g., Van DeVeer v. RTJ, Inc.*, 81 Ark. App. 379, 385–86, 101 S.W.3d 881, 884 (2003). A case about a lumber-mill employee summarizes the law. Tompkins hurt himself while moving a several-hundred-pound barrel of oil alone after he couldn't find someone to help. *J.L. Williams & Sons, Inc. v. Tompkins*, 195 Ark. 1146, 1149–50, 114 S.W.2d 845, 846–47 (1938).

> The law is that where the perils of the employment are known to the master but unknown to the employee, the master has the duty of apprising the employee thereof and a neglect by the master of such duty creates actionable negligence; but where the employee's knowledge of the perils of the employment equals or surpasses that of the master, then there is no duty upon the master to apprise the employee of something already well known to him.

*Tompkins*, 195 Ark. at 1150, 114 S.W.2d at 847 (quotation and citations

omitted); *see also Chicago, Rock Island & Pacific Railway Co. v. Grubbs*, 97 Ark. 486, 488–90, 134 S.W. 636, 638 (1911). Tompkins hurt himself at his employer's mill. No sound reason exists, though, to apply a different rule to non-employer premises where an employee is sent.

Leal had been working as a conductor for MNA for about six months. He was not inexperienced. He was familiar with Entergy's back gate, having used it several times. He had, in the course of his railroading, walked on lots of uneven and muddy surfaces. His trial testimony was unequivocal: he knew the shoulder at the back gate was muddy and brushy, and that the gate had swung back almost to the fence, so that he'd have to cross the shoulder to retrieve the gate and lock it. He knew the gate was stuck in the mud and weeds. MNA, for its part, knew about the details of the gate and surrounding area and should have known about what the weather had done to that area. But the railroad had no duty to warn Leal because his knowledge of the particular perils presented that night exceeded his employer's. "[H]e clearly assumed the risk." *Tompkins*, 195 Ark. at 1150, 114 S.W.2d at 846.

Assumption of the risk is sometimes for the jury. *Breece-White Mfg. Co. v. Baker*, 106 F.2d 815, 818 (8th Cir. 1939) (Arkansas law). This is because, though the issue ends in a duty or not, it is necessary fact-bound, shading into the standard-of-care issues. The issue is one of law here. The risks of slipping and falling while trying to close a gate caught in a muddy, brushy area are obvious to anyone who has ever dealt with a gate on a back road. These risks are even more obvious to an employee such as Leal, whose job required him to work on and around railroad track in general and with this gate in particular. There was nothing hidden about this danger. *Compare, e.g., Baker*, 106 F.2d at 818 (oddly configured and hidden part of tractor radiator trapped leaves causing overheating; employee oblivious); *Choctaw, Oklahoma & Gulf Railroad Co. v. Jones*, 77 Ark. 367, 371–72 & 376–78, 92 S.W. 244, 246 & 248 (1906) (plaintiff struck by toppled scaffolding that fell in unexpected way because it caught on an unseen bolt); *Stastney*, 87 Ark. at 323–26, 112 S.W. at 740–42 (recently stacked pile of lumber contained two boards that extended over track and were caught by train; hurried employee couldn't see the projecting boards in the train's path).

There is a factual wrinkle: MNA's insistence that the back gate be kept locked. This insistence was embodied in Ryan Richardson's stern January 2000 memo.

> Also, the lock is on the back gate at Independence. This is a privilege that is being abused. We <u>must</u> always without fail lock the gate when not in use. There have been trespassers on the property by way of the back gate. If we do not lock the gate when not used we will lo[]se our privilege and that will only hurt us. Ask if any questions.

*MNA's Trial Exhibit 29* (emphasis original). The memo stuck with Leal. He carried a copy on his clipboard. He knew he was supposed to close and lock the gate that night when he finished his work, even though it had been open and stuck back in the weeds and mud when he got there. "Must" and "always" and "without fail" are strong words from the boss. This was a direct and unequivocal order.

MNA's standing order does not change the duty analysis. This was not a situation where a supervisor, a person presumed to have better information about risks and danger, nonetheless ordered an employee into harm's way. *Compare, e.g., St. Louis, Iron Mountain & Southern Railway Co. v. Rickman*, 65 Ark. 138, 45 S.W. 56 (1898) (foreman of section gang ordered crew, in the face of approaching train, to keep hand car on the track and proceed to the next

crossing before leaving the track). This was not a case of emergency. Nor was it a case of dangerous alternatives on the railroad's premises (or in its equipment) created by MNA's negligence, what the *Restatement* aptly calls a choice of evils. RESTATEMENT § 523 & comment c. This kind of choice can eliminate the assumption-of-risk bar. *Ibid.*; *see also, Missouri Pacific Railroad Co. v. Brown*, 195 Ark. 1060, 1067–68, 115 S.W.2d 1083, 1086–87 (1938). The ingredient missing here is a breach of any duty by MNA as to the premises. The railroad didn't control the back gate area. At most MNA had a duty to warn Leal. RESTATEMENT § 492. But again, no warning was required here because of Leal's superior knowledge of the dangerous conditions at the back gate on the night he fell. *Tompkins*, 195 Ark. at 1149-50, 114 S.W.2d at 846–47.

The Arkansas law of premises liability throws a side light. An injured employee whose work requires him to encounter an obvious danger can recover notwithstanding the patent risk. *Jenkins v. International Paper Co.*, 318 Ark. 663, 670–71, 887 S.W.2d 300, 303–04 (1994); *Van DeVeer*, 81 Ark. App. at 389, 101 S.W.3d at 886–87. The employee's right of recovery, however, runs only against the owner or occupier of the premises—the party having control of the dangerous circumstances. *Ibid.*

**5.** Our jury was attentive and diligent. If MNA owed any duty as to the back gate other than warning, the evidence mentioned earlier about why MNA should have known about the dangerous conditions that night would make the negligence question one for the jury. Add to the mix MNA's rule requiring employees to use the safest route, the availability of other ways in and out of Entergy's premises, as well as the standing order to close the gate. These undisputed facts make the case for the railroad's negligence in the circumstances even more powerful. But beneath the alleged lack of due care must be a duty. *Coca-Cola Bottling Co. of Memphis, Tennessee v. Gill*, 352 Ark. 240, 251–57, 100 S.W.3d 715, 721–25 (2003); *Ethyl Corp. v. Johnson*, 345 Ark. 476, 481–84, 49 S.W.3d 644, 648–50 (2001); *Lewis*, 2011 Ark. App. 756, at 4, 2011 WL 6062678, at *2.

The jury's 50/50 apportionment through its answer to question 3 was a fair result in an important sense: Entergy was responsible for the back gate area, and MNA's work put Leal in the dangerous conditions there; so it was equitable to split damages resulting from the combination of circumstances between the companies. The parties by contract, however, chose a different standard than fairness. They adopted the Arkansas law of negligence as

between an employer and its employee working on premises of another. *Petty v. Missouri & Arkansas Railway Co.*, 205 Ark. 990, 996, 167 S.W.2d 895, 898 (1943) (parties contract with reference to existing law). And under that law, MNA had no common-law duty to Leal in the circumstances presented. The Court therefore sees no alternative but to depart from the jury's verdict in entering judgment.

**6.** MNA's motion for judgment as a matter of law on the apportionment issue captured in question 3 is granted. The Court will enter judgment for the railroad, notwithstanding the jury's verdict, for $268,233.29—100% of the agreed amount covering the settlement paid to Leal and attorney's fees and expenses incurred in the FELA case. Whether MNA is entitled to pre-judgment interest, to attorney's fees related to this case, and the specific amount of recoverable Rule 54 costs are issues the parties should confer about, attempt to resolve, and then present to the Court by 20 November 2012 as agreed or disputed. And the parties are, of course, also free to renew any motion for judgment as a matter of law or move for a new trial as allowed by Rule 50(b) after entry of judgment.

So Ordered.

D.P. Marshall Jr.
United States District Judge

6 November 2012